## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Martin J. Walsh, Secretary of Labor,
United States Department of Labor,[1]

      Plaintiff,

v.

All Temporaries Midwest, Inc., a
Minnesota corporation, and Mark
Liveringhouse, an individual,

      Defendants.

Case No. 17-cv-3330 (JNE/TNL)

**REPORT AND
RECOMMENDATION**

---

David James Tanury and Margaret A. Sewell, U.S. Department of Labor, Office of the Solicitor, 230 South Dearborn Street, Suite 844, Chicago, IL 60604 (for Plaintiff); and

Mark Liveringhouse, 4200 Central Avenue, Columbia Heights, MN 55421 (*pro se* Defendant).

---

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the Secretary of Labor's Motion for Adjudication of Civil Contempt. (ECF No. 12.) This matter has been referred to the undersigned for a Report and Recommendation to the Honorable Joan N. Ericksen, District Judge for the United States District Court for the

---

[1] This lawsuit was initiated by a previous Secretary of Labor, R. Alexander Acosta. (*See* ECF No. 1.) R. Alexander Acosta was Secretary of Labor from 2017-2019; Eugene Scalia was Secretary of Labor from 2019-2021. *See Past Secretaries of Labor*, U.S. Department of Labor, https://www.dol.gov/general/aboutdol/history/sec-chrono (last visited July 29, 2021). Walsh was sworn in as Secretary of Labor on March 23, 2021. *Office of the Secretary*, U.S. Dept. of Labor, https://www.dol.gov/agencies/osec (last visited July 29, 2021). The Court has now substituted Walsh for Scalia. *See* Fed. R. Civ. P. 25(d).

District of Minnesota, pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. (*See also* ECF No. 41 (referring the motion to the undersigned).)

The Court held an evidentiary hearing on the motion on June 1, 2021. (ECF No. 60.) David J. Tanury of the United States Department of Labor ("DOL"), Office of the Solicitor, appeared on behalf of the Secretary of Labor ("Secretary" or "Plaintiff"). Defendant Mark Liveringhouse ("Liveringhouse") appeared *pro se*. Defendant All Temporaries Midwest, Inc. ("All Temporaries") failed to appear.[2]

The Court heard testimony from Investigator LeeAnn Wolf, of the DOL's Wage and Hour Division, and Liveringhouse. The Secretary offered and the Court received into evidence 10 exhibits: Plaintiff's Exhibit 1, WH-55 Wage Transcription and Computation sheets, filed previously as ECF No. 13-4; Plaintiff's Exhibit 2, Declaration of Wage and Hour Investigator LeeAnn Wolf, filed previously as ECF No. 13-3; Plaintiff's Exhibit 3, Nancy Cassell Back Wages Detail; Plaintiff's Exhibit 4, Nancy Cassell Original Pay Data; Plaintiff's Exhibit 5, Nancy Cassell Weekly Payroll Report; Plaintiff's Exhibit 6, Anthony Alonzi Original Pay Data; Plaintiff's Exhibit 7, Anthony Alonzi Weekly Payroll Report; Plaintiff's Exhibit 8, Nancy Cassell Pay Data Excerpt, filed previously as ECF No. 37-1; Plaintiff's Exhibit 9, List of "Overtime Allowed Employees"; and Plaintiff's Exhibit 10, All Temporaries Midwest Advertisement for Employment. Liveringhouse offered and the

[2] The Court previously urged corporate Defendant All Temporaries Midwest, Inc. ("All Temporaries") to obtain counsel on the basis that corporations cannot appear in federal court unless they are represented by counsel. (*See* Order, ECF No. 35; Report & Recommendation, ECF No. 36; Order Adopting Report & Recommendation, ECF No. 40.) No counsel of record has since appeared on behalf of All Temporaries. The Court thus considers the testimony and arguments made by Liveringhouse as a defense to the Secretary's motion as it applies to him individually, and notes that All Temporaries has not responded or objected to the Secretary's motion.

Court received into evidence four exhibits: Defendant's Exhibit 1, Nancy Cassells [sic] Payroll History; Defendant's Exhibit 2, Anthony Alonzi Timecards; Defendant's Exhibit 3, Anthony Alonzi Shifts; and Defendant's Exhibit 4, Nancy Cassell's Timecards.[3]  At the conclusion of the hearing, the parties agreed, and the Court ordered that each party file and serve proposed findings of fact and conclusions of law.  These were filed on June 25, 2021. (ECF Nos. 65-67.)  The motion was then taken under advisement.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Motion be **GRANTED**.

## II.  FINDINGS OF FACT

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A.  The Defendants

All Temporaries is and has been a corporation with an office and place of business at 4200 Central Avenue Northeast, Minneapolis, Minnesota 55418.  (Pl's Ex. 2 ("Wolf Decl.") ¶ 7.)  At all relevant times, All Temporaries has been engaged in the business of providing temporary nurse staffing to long-term care centers in Minnesota.  (*Id.*; *see* Tr.[4] 17:16-18:5.)  All Temporaries pays their employees directly and they are paid according to the hours that they work.  (Tr. 18:7-15.)

---

[3] The Secretary first objected to the admission of these exhibits on the basis that they were untimely filed and disclosed to the Secretary according to the Court's scheduling deadlines.  (*See* ECF No. 54.)  The Court noted but overruled the timeliness objection.  (ECF No. 56 at 2.)  During the hearing, the Secretary stated that, after having the opportunity to review the exhibits, he did not object to the admission of the exhibits, including if Liveringhouse did not testify.  (Tr. 8:7-14; 9:7-19.)  The Court formally overruled the Secretary's objection to timeliness and received Defendant's Exhibits 1-4 into evidence.  (*Id.* 8:15-24; 9:1-6; *see also id.* 10:25-11:1.)
[4] "Tr." refers to the official transcript of the evidentiary hearing held on June 1, 2021.

Liveringhouse is, and at all relevant times has been, the owner of All Temporaries. (Wolf Decl. ¶ 8; Tr. 127:13-15.)   He periodically performs work at All Temporaries' Minneapolis address.  (Wolf Decl. ¶ 8.)  Liveringhouse is involved in the daily operations and management of All Temporaries and is directly responsible for the pay practices at All Temporaries.  (*Id.*; *see also* Tr. 17:6-13, 131:10-14, 145:17-146:19.)

All Temporaries' annual dollar revenue was $2,875,573.00 in 2018; $2,527,799.00 in 2017, and $2,991,229.00 in 2016.  (Wolf Decl. ¶ 9; *see also* Tr. 18:19-21.)  Employees of All Temporaries handle goods that have moved in commerce, such as Quill office paper, manufactured in Lincoln, Illinois.  (Wolf Decl. ¶ 9; *see also* Tr. 19:8-13.) As such, All Temporaries is and has been a covered enterprise under the FLSA.  (Wolf Decl. ¶ 9.)

**B.  The Consent Judgment**

On July 26, 2017, the Secretary filed a Complaint against Defendants to enjoin them from violating provisions of Sections 7, 11, and 15 of the Fair Labor Standards Act of 1938, as Amended ("the FLSA"), and to recover unpaid overtime compensation owed to Defendants' employees.  (Compl. at 1, ECF No. 1 (citing 29 U.S.C. § 201 *et seq.*).)  The Secretary alleged that Defendants violated provisions of Sections 7 and 15(a)(2) of the FLSA for failing to pay the overtime premium for hours worked over 48 hours in a workweek; and violated provisions of Sections 11 and 15(a)(5) by failing to make, keep, and preserve accurate employee records from June 9, 2014 through June 8, 2016.  (*Id.* at 3-4.)

On October 11, 2017, Defendants agreed to the entry of a Consent Judgement in this case.  (ECF No. 7.)  Defendants agreed to pay back pay and liquidated damages to

current and former employees as part of their agreement with the Secretary. (*Id.* at 1, 3-5.) Defendants, their officers, agents, servants, and employees, as well as those persons in active concert or participation with Defendants, were all permanently enjoined from violating the overtime and recordkeeping provisions of the FLSA. (*Id.* at 2-3.) Liveringhouse is aware of the Consent Judgment and knows that pursuant to the Judgement he was ordered to comply with the overtime and recordkeeping provisions of the FLSA. (Tr. 143:18-144:1.)

### C. Wolf's Investigation

Investigator LeeAnn Wolf ("Investigator Wolf") is a Wage and Hour Investigator with the DOL's Wage and Hour Division. (Tr. 12:8-10.) She started working at the DOL in January of 2013. (*Id.* 12:22-23, 14:20-22.) She has worked in the Minneapolis office since September of 2016, and prior to that worked in the DOL's Des Moines office. (*Id.* 12:15-21.) As part of her duties, Investigator Wolf investigates employers to determine their compliance with federal laws such as the FLSA. (*Id.* 13:1-4.) Investigator Wolf conducts approximately 20 investigations per year, and the majority of those investigations are FLSA investigations. (*Id.* 14:16-15:3.) The Court finds that Ms. Wolf was a credible witness.

Investigator Wolf began her investigation of Defendants in late September 2019. (*Id.* 15:17-19.) Her investigation included contacting the employer, requesting records, an initial conference with the employer, a review of records, interviews, and a final conference with the employer. (*See id.* 15:22-16:6.) During the initial conference in November 2019, Investigator Wolf met with All Temporaries' office manager in a conference room at the

location of All Temporaries, and Liveringhouse appeared by phone from Florida. (*Id.* 16:16-17:2.) During this initial meeting, Liveringhouse explained that while employees were typically not allowed to work overtime, certain employees were allowed to do so under a separate agreement. (*See id.* 19:18-20:1.) In these instances, there was a negotiated lower rate of pay for certain hours, and if those hours were not available, Defendants made a payment to the employee for travel expenses. (*Id.*) This was in contrast to the standard wage rates offered to other employees - $20 per hour for a Certified Nursing Assistant ("CNA"), $34 per hour for a Licensed Nurse Practitioner ("LPN"), and $44 per hour for a registered nurse ("RN"). (*See id.* 72:7-9.)

Investigator Wolf received raw payroll data from Liveringhouse in order to review compliance with the overtime provisions of the FLSA. (*See. e.g.*, *id.* 20:9-16, 25:12-19.) These payroll records were from July 16, 2017 through October 20, 2019. (*Id.* 65:5-8.) Investigator Wolf used this data to compute a regular rate for employees and calculate overtime due to certain employees pursuant to the FLSA. (*See* Pl.'s Exs. 1, 3-8.) The investigation showed that Defendants have not been compliant with the FLSA's overtime and recordkeeping provisions or the Consent Judgement. At the closing conference with Defendants in February 2020, Liveringhouse told Investigator Wolf that he disagreed with the findings of the investigation and maintained that he was in compliance with the FLSA pursuant to 29 U.S.C. § 207(e). (Tr. 63:5-18.)

### D. The "Mileage" Scheme

For the relevant time period, Defendants kept a list of employees that were allowed to work overtime. (*See* Pl.'s Ex. 9.) Defendants sometimes paid these employees extra

compensation labeled as "mileage" on their payroll records.  (*See* Pl.'s Ex. 5; *see also* Pl.'s Exs. 1, 4.)  These "mileage" payments are not included as extra compensation on the employees' W-2s, and Defendants do not pay payroll taxes on this compensation.  (Tr. 149:25-150:7.)  Nor do Defendants include this extra compensation in the employees' regular rate for purposes of calculating overtime.  (*See* Pl.'s Ex. 1.)  Defendants continued to utilize this "mileage" scheme up to and as of the date of the evidentiary hearing.  (Tr. 151:7-15.)

There is no evidence that the "mileage" payments were for mileage or other travel expenses.  (*Id.* 27:25-28:12.)  When the "mileage" payment is added to the gross pay and divided by the total hours worked, it almost always results in the regular rate of pay advertised for employees, which is also the regular rate of similarly situated employees that do not regularly work overtime.  (*Id.* 30:6-10, 39:5-20, 40:14-18; *see also* Pl.'s Exs. 1, 10.) Defendants purposefully used the "mileage" payment to get to or very close to the advertised rate of pay.  (Tr. 49:7-10, 50:4-7; *see also* Def.'s Ex. 1.)  This "mileage" scheme results in certain employees being paid a regular rate for all hours worked, including overtime.  (Tr. 35:3-12.)  Defendants therefore failed to pay certain employees for hours worked in excess of 40 hours per week at a rate of one and a half times their regular hourly rate.  (*Id.* 50:8-16; Pl.'s Ex. 1; Wolf Decl. ¶ 5(b).)

### E.  Other Overtime Calculations

There were also a few instances where the records Defendants produced show that they paid employees their regular rate, or "straight time," for hours worked over 40 hours in a particular workweek.  (Tr. 52:9-11; Wolf Decl. ¶ 5(a); *see* Pl.'s Ex. 1 at 4, 7, 8, 48, 52,

56, 57, 59, 63.)  This resulted in certain employees not being paid an overtime rate when they worked in excess of 40 hours during a workweek.

### F.  Recordkeeping Practices

During the relevant time period, Defendants failed to keep accurate pay records because the regular rate was not properly shown on the pay records due to the implementation of the "mileage" scheme.  (Tr. 54:16-17, 60:1-4; *see also* Pl.'s Ex. 5; Wolf Decl. ¶ 6.)  Defendants failed to recognize the "mileage" payment as a wage that should be factored into the regular rate of pay.  (Tr. 55:24-55:2.)  Defendants also failed to keep accurate records as it relates to employee Debra Thompson.  (*Id.* 55:13-56:21, 142:15-20; *see also id.* 144:7-9; Pl.'s Ex. 1 at 65.)  While she had been paid as an independent contractor (*see* Tr. 61:21-22), Ms. Thompson was an employee of Defendants due to the nature of her employment and the hours she worked.  (*See, e.g.*, *id.* 60:12-24.)

### G.  The Motion for Contempt

On October 26, 2020, the Secretary filed a Motion for Adjudication of Civil Contempt against Defendants.  (ECF No. 12.)  In this motion, the Secretary alleged that, at least during the time period from approximately July 10, 2017 through October 20, 2019, Defendants failed to pay the legally prescribed overtime to at least 57 employees in violations of the Consent Judgment and Sections 7 and 15(a)(2) of the FLSA.  (*Id.* at 4-6.)

Specifically, the Secretary alleged that:

> For the majority of these employees, [Defendants] used a rate lower than the employees' regular rate when calculating the overtime premium for hours worked in excess of 40 in a workweek, which resulted in paying employees less than one and one-half times the regular rate for hours worked in excess

of 40 in a workweek. This practice of using a rate lower than the regular rate to calculate overtime premiums resulted from [Defendants'] failure to include all applicable remuneration in the "regular rate," as required by 29 U.S.C. § 207(e). Specifically, [Defendants] falsely and inaccurately categorized certain payments made to employees as compensation for "mileage" and did not include these payments in their regular rate when calculating overtime premiums. Despite [Defendants] labelling payments as "mileage" payments, [Defendants] were not actually paying for travel expenses but instead were compensating employees weekly for hours worked that should have been included in the employees' regular rate. These false "mileage" payments were precisely calculated by [Defendants] in such a manner each workweek to give the impression overtime hours were paid at one and one-half times the regular rate when, in fact, overtime hours actually were paid at or very near the regular rate in every workweek without an overtime premium in violation of section 7 of the [FLSA].

(*Id.* at 5-6 (citing 29 U.S.C. § 207, 215(a)(2)).) Other employees were "simply paid the regular rate ('straight time') for hours worked in excess of 40 in a workweek." (*Id.* at 5.) The Secretary also alleged that Defendants had violated Sections 11(c) and 15(a)(5) of the FLSA, as well as the Consent Judgment, by failing to make, keep, and preserve adequate and accurate records by failing to show the regular rates at which employees were employed; mislabeling wages for hours worked as a "mileage" reimbursement; and failing to track hours worked by employees working as office staff. (*Id.* at 6.)

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

## A.  Contempt Proceedings

"A civil contempt proceeding is a proper means for ensuring compliance with injunctive orders issued to enforce the FLSA." *Chao v. SOS Sec. Serv., Inc.*, 526 F. Supp. 2d 196, 201 (D.P.R. 2007) (citations omitted).  To be found in civil contempt, "the Secretary must show that Defendants violated the [Consent Judgment] by clear and convincing proof."  *Scalia v. Force Corp.*, No. 16-cv-40103-TSH, 2020 WL 1527329, at *2 (D. Mass. Mar. 31, 2020) (citing *Donovan v. Sovereign SEC., Ltd.*, 726 F.2d 55, 59 (2nd Cir. 1984)).  The violation of the Consent Judgment need not be willful; nor must the Secretary prove that Defendants violated the Consent Judgment in bad faith.  *Chao*, 526 F. Supp. 2d at 201 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)) (additional citation omitted).   "Once the Secretary has proven that the employer is delinquent in complying with an injunction under the FLSA, [he] has established a prima facie case of civil contempt."  *Id.* at 202 (citation omitted).

Once a prima facie case for contempt has been established, the burden shifts to Defendants to show through clear and convincing evidence that they cannot comply with the earlier judgment.  *Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985).  "The employer's burden is a heavy one.  A party who violates an injunction under the FLSA must show that he was reasonably diligent and energetic in attempting to accomplish what was ordered."  *Chao*, 526 F. Supp. 2d at 202 (internal quotation omitted). Defendants here "must do more than simply show that [their] efforts to comply were substantial or made in good faith; rather, [Defendants] must plainly and unmistakably demonstrate an inability to comply with the court's order."  *Id.*

### B. Defendants' FLSA Violations

#### 1. Overtime Provisions

According to the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "The keystone of Section 7(a) is the regular rate of compensation. On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945); *see also Hodgson v. Elm Hill Meats of Ky., Inc.*, 327 F. Supp. 1009, 1014 (E.D. Ky. 1971) ("[I]n order for an employer to satisfy the requirements of section 7(a) it must specify a regular rate of pay for each employee from which the employee's overtime pay may be computed.").

The FLSA defines "regular rate" as the total weekly pay divided by the weekly hours. 29 U.S.C. § 207(e); *see also* 29 C.F.R. § 778.109 ("The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."). Employers may only exclude certain limited payments from an employee's regular rate, provided these payments meet the requirements of the FLSA. *See* 29 U.S.C § 207(e)(1)-(8); 29 C.F.R. § 778.200-225. One of these exceptions is for:

> payments made for occasional periods when no work is
> performed due to vacation, holiday, illness, failure of the
> employer to provide sufficient work, or other similar cause;
> reasonable payments for traveling expenses, or other expenses,
> incurred by an employee in furtherance of his employer's
> interests and properly reimbursable by the employer; and other
> similar payments to an employee which are not made as
> compensation for his hours of employment.

29 U.S.C. § 207(e)(2). "The regular rate is . . . an 'actual fact,' and in testing the validity

of a wage agreement under the [FLSA] the courts are required to look beyond that which

the parties have purported to do." *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 204

(1947) (citation omitted).

### a. The "Mileage" Scheme Violations

The evidence here clearly and convincingly shows that the "mileage" payments

functioned as a way to get around the FLSA's overtime provisions, and those payments

should be included in the employees' regular rate. As an initial matter, there was no

evidence presented that the "mileage" payments reflect any sort reasonable, reimbursable

travel expenses. *See* 29 U.S.C. § 207(e)(2); 29 C.F.R. § 778.217. Employees claimed they

were not reimbursed for their mileage and that they did not claim mileage. (Tr. 29:21-30:3,

50:12-23; *cf.* Wolf Decl. ¶ 5(b) ("Liveringhouse admitted to me the compensation he

categorized as 'mileage' on payroll records did not actually represent re-imbursement for

mileage.").) Nor were employees paid for lodging. (Tr. 50:23-51:2.)

Instead, Defendants would pay certain pre-approved employees fluctuating

"mileage" payments, which nearly always resulted in employees being paid at a regular

rate for all hours, including overtime hours. (*See* Pl.'s Exs. 1, 3-5, 8-9; Def.'s Ex. 1.)

Specifically, the "mileage" payments appear, even on Liveringhouse's own admission, to be based on a mathematical formula which would almost always result in employees being paid at the advertised regular rate for all hours worked. (*See* Def.'s Exs. 1, 4; Pl.'s Ex. 1; Tr. 144:19-22, 160:5-15, 162:21-163:18.) For example, Liveringhouse claimed employee and CNA Nancy Cassell's regular rate is $17.50 per hour (*see* Tr. 136:17-19); pay data shows, however, that when adding in the fluctuating "mileage" payments from various workweeks, she is almost always paid $20 per hour for all hours worked (including overtime)—which is the regular rate of pay for CNAs that do not regularly work overtime. (*See* Pl.'s Exs. 1, 4, 10; Def.'s Ex. 1.) This is further borne out by the Secretary's evaluation of all employee pay data, which shows that when adding the "mileage" payments to wages and dividing them by total hours worked by a particular employee, it almost always produces a standard regular rate that matches the advertisements for employment. (*Compare* Pl.'s Ex.1 *with* Pl.'s Ex. 10; *see also* Wolf Decl. ¶ 5(b).) Some employees even acknowledge that this "mileage" payment brought them up to the regular rate for all hours, including hours where they should have been paid an overtime premium. (*See* Tr. 29:24-30:2.)

Liveringhouse argues that these were individual verbal agreements made with certain employees where the employees would be paid for hours *not worked*. (*See, e.g.*, Tr. 164:13-19 ("[W]e made agreements to -- for special temporary staffing assignments for these employees to work. It was a voluntary agreement, and . . . we pay them a regular rate for the first 40 hours, time and a half for the next, and then compensation if they did not work . . . the number of hours that we promised them to be scheduled.").) He suggests that

it is his right to negotiate different regular rates for certain employees even if they hold the same job title and qualifications so that they can work additional hours, and to pay them for hours not worked pursuant to these individual agreements. At the hearing, Liveringhouse summarized:

> So when special situations come up where employees want to agree to work more . . . than 40 hours . . . we made an agreement that makes the situation work for both the employee and the company. Otherwise, they would not have the overtime opportunities, because . . . If I have to pay somebody . . . $20 an hour at overtime rates, I will lose money for each and every hour that that employee works. So to be able to be scheduled to work overtime, the employee and the employer made an agreement that would specify a number of hours that they work, a rate of pay that they would be paid, and they'd be paid for [] that rate of pay. And if we didn't hold up that agreement, we would give them additional compensation but pay them based upon a formula that we computed to -- that created a fixed rate for each hour that they were not -- did not work in that workweek.

(Tr. 135:16-136:9.) Liveringhouse further argued that these payments should not be included when calculating an employee's regular rate. (*See id.* 154:15-19.)

But Liveringhouse's theories for why the "mileage" payments should not be factored into the regular rate is without merit and would circumvent the FLSA's overtime provisions in a way that would render them meaningless. It is true that, pursuant to Section 207(e)(2), "payments made for occasional periods when no work is performed due to . . . failure of the employer to provide sufficient work" are not included in the calculation of the regular rate. Regulations, however, provide further guidance on the limits of this exemption. In order to be excluded from the regular rate calculation, the payments must be made "in amounts approximately equivalent to the employee's normal earnings for a

14

similar period of time."  29 C.F.R. § 778.218(a).  The regulations also clarify the term

"failure of the employer to provide sufficient work," stating:

> The term "failure of the employer to provide sufficient work"
> is intended to refer to  *occasional, sporadically recurring*
> *situations* where the employee would normally be working but
> for such a factor as machinery breakdown, failure of expected
> supplies to arrive, weather conditions affecting the ability of
> the employee to perform work and similarly unpredictable
> obstacles beyond the control of the employer.  The term does
> not include reduction in work schedule . . . ordinary temporary
> layoff situations, or any type of routine, recurrent absence of
> the employee.

*Id.* § 778.218(c) (emphasis added).

The evidence in the calculations produced by the Secretary, which are based off of

pay records provided by Defendants, clearly and convincingly shows that the "mileage"

payments were not occasional nor sporadic.  (*See generally* Pl.'s Ex. 1.)  These payments

were made almost every workweek for employees who regularly worked overtime.  (*Id.*)

For example, CNA Cassel worked more than 40 hours per week in almost every workweek

for nearly two years and was almost always paid for "mileage."  (*Id.* at 12-14.)  Nor are the

"mileage" payments in amounts approximately equivalent to the employee's normal

earnings for a similar period of time.  *See* 29 C.F.R. § 778.218(a).  Instead, the value of

these "mileage" payments, by Liveringhouse's own admission, are "inversely proportional

to the amount of hours" the employees work.  (Tr. 141:8-9; *see also id.* 159:11-18

(explaining the weighting factor of his payment scheme further).)

Defendants' reliance on *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942) is

misplaced.  (*See, e.g.*, Tr. 166:25-167:6.)  In *Belo Corp.*, the Supreme Court held that a

particular payment scheme where the overtime regular rate fluctuated week by week was permissible because it was adjusted so that the employee was always paid the weekly minimum payment the employer had stated it would provide the employee, and the employer always paid the employee at an overtime wage equal to or greater than time and a half in compliance with the FLSA's overtime requirements. *Belo Corp.*, 316 U.S. at 632. These "*Belo* contracts" have since been codified by Congress in the FLSA. *See* 29 U.S.C. § 207(f).

The agreement Defendants made with certain employees are not valid *Belo* contracts because they do not meet the three requirements outlined by Section 207(f). *Cf. Johnson v. Dierks Lumber & Coal Co.*, 130 F.2d 115, 118 (8th Cir. 1942) ("Contracts between employers and employees subject to the [FLSA] and prohibited by or inconsistent with its provisions are illegal, and not binding upon the employees."). First, in order to be a permissible *Belo* contract, an employee must be "employed pursuant to a bona fide individual contract," or the agreement must be made pursuant to a collective bargaining agreement. 29 U.S.C. § 207(f). Liveringhouse claims, without persuasive support, that the agreements he made with employees that were paid "mileage" payments were verbal. (Tr. 145:20-146:4.) But, no employee testified to confirm the existence of an agreement. No contract with an agreed upon hourly rate or weekly guaranteed payment was produced. On the other hand, the Secretary provided credible evidence that some employees could not explain the "mileage" payments. (*See id.* 29:22-24, 30:3-6.) The lack of a bona fide contract comporting with Section 207(f) is further supported by the fact that All

16

Temporaries' employee payroll reports do not specify the regular rate of pay for its employees. (*See* Pl.'s Exs. 5 & 7.)

Second, to be a valid *Belo* contract, the duties of an employee must "necessitate irregular hours of work." 29 U.S.C. § 207(f). While at first it would appear that All Temporaries' employees, who are temporary employees assigned to various long-term care facilities, necessarily work irregular hours according to the needs of the facilities to which they are assigned, the regulations guiding this provision of the FLSA further narrow Section 207(f)'s application. *See* 29 C.F.R. § 778.406 (specifying that for an employee to be working "irregular hours" the irregularity must occur during the 40-hour work week and not only during overtime hours); *see also Boll v. Fed. Rsrv. Bank of St. Louis*, 365 F. Supp. 637, 644-45 (E.D. Mo. 1973), *aff'd*, 497 F.2d 335 (8th Cir. 1974). As has been demonstrated by the Secretary's review of All Temporaries' pay records, the employees paid the "mileage" payments were employees that almost exclusively had hour fluctuations during the overtime workweek only. (*See* Pl.'s Ex. 1.)

Third, a valid *Belo* contract must specify a regular rate of pay where overtime payments are set at least time and a half of that regular rate of pay and provide a weekly guarantee of pay at sixty hours or less based on hourly rates specified in the contract by the employer. 29 U.S.C. § 207(f). Defendants have not provided evidence of contracting for a weekly guarantee of pay, and instead have attempted to guarantee a certain number of hours for some employees. The purported agreements Defendants have made with certain employees are not valid *Belo* contracts pursuant to Section 207(f).

17

The evidence in this case clearly and convincingly establishes that Defendants worked backwards from the regular rate normally paid to employees using a formula designed to get around the FLSA's overtime requirements.  (*See* Tr. 153:14-154:11; *see also id.* 160:1-18 (concluding that the weighted factor of his "marginal cost of labor" is $20 per hour, which is the regular rate of pay for CNAs that do not regularly work overtime).)  The alleged "mileage" payments were not for mileage and, instead, merely a number produced by the function of the formula.  Contracting with certain employees to accept a lower rate of pay so that they can work all hours, including overtime hours, at the standard rate of others in the same role would also lead to absurd results and completely circumvent the FLSA.  The "mileage" scheme devised by Liveringhouse violates the overtime provisions of the statute.

### b.  Other Overtime Violations

The "mileage" payment scheme clearly and convincingly demonstrates that Defendants have violated the overtime provision of the FLSA, and the Court could end its analysis there.  Records also show, however, that there were certain weeks that certain employees were not paid the one- and one-half-time overtime rate for hours worked in excess of the 40-hour workweek as prescribed by Section 207(a)(1) of the FLSA.  (*See* Pl.'s Ex. 1 at  4, 7, 8, 48, 52, 56, 57, 59, 63; Wolf Decl. ¶ 5(a).)  Liveringhouse explained that Defendants did not  improperly pay employees "straight time" when they worked over 40 hours in a workweek and explained that these were instead administrative errors or instances where an employee would turn in a late timecard and compensation would appear on the following week's payroll.  (*See, e.g.*, Tr. 129:13-130:19; *see also* Liveringhouse

18

Decl.¶ 5, ECF No. 28.)   The Court is not swayed by Liveringhouse's explanation. Liveringhouse only provided information to refute these overtime allegations as it applies to employee Anthony Alonzi.  (*See* Def.'s Ex. 2.)  He has not provided any evidence as it applies to other employees.  Based on the record and having evaluated the testimony and other evidence, the Court concludes that, with the exception of the instances related to Alonzi, Defendants did not properly pay those employees overtime in the relevant workweeks.  *See Smith v. Superior Casing Crews*, 299 F. Supp. 725, 731 (E.D. La. 1969) (Pursuant to Section 211(c), the FLSA requires the employer "to keep accurate time and wage records" and the employer thus "cannot escape liability by his own dereliction.").

## 2.  Recordkeeping Provisions

The FLSA also requires employers to "make, keep, and preserve" records of the persons they employ, and "the wages, hours, and other conditions and practices of employment" as prescribed by the DOL's regulations.  29 U.S.C. § 211(c).  "The FLSA's recordkeeping provisions are vital in ensuring employer compliance with the statute." *United States Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 287 (4th Cir. 2019) (citation omitted).  These records must include, for example, daily hours, weekly hours, the basis on which employees' wages are paid, regular rates of pay, total daily or weekly straight time earnings, and the total overtime earnings per workweek.  *See* 29 C.F.R. § 516.2(a)(1)-(12).

Defendants have violated the recordkeeping provisions of the FLSA.  For example, regulations specify that employers "shall maintain and preserve payroll or other records containing . . . [h]ours worked each workday."  29 C.F.R. § 516.2(a)(7).  By

Liveringhouse's own admission, All Temporaries did not keep records of the hours worked by employee Debra Thompson until after the DOL investigation began.  (*See* Tr. 141:10-14, 141:25-142:20, 144:7-9.)   In addition, as discussed at length above, Defendants intentionally mislabeled wages for certain employees as an improper "mileage" reimbursement, and therefore did not keep accurate records of those employees' regular rates.  *See supra* Section III(B)(1)(a).

### C.  Defendants' Violations of the Consent Judgment

The Court concludes that, based on the record and the evidence presented at the evidentiary hearing, the Secretary has not only established a prima facie case of civil contempt, but has also clearly and convincingly established that Defendants have violated the overtime and recordkeeping provisions of the FLSA, *see supra* Section III(B), and thereby also violated the Consent Judgment.  (*See* ECF No. 7.)

The Court further concludes that Defendants have not met their burden to show that they could not comply with the Consent Judgment.  To the contrary, in numerous instances the evidence shows that Liveringhouse set up paying certain employees differently (*see, e.g.*, Tr. 136:1-9, 137:8-14, 164:13-19), and created the "mileage" compensation formula for the employees that regularly worked over 40 hours per week to "legally" get around paying overtime based off of the typical regular rate used for other employees.  (*See id.* 145:10-25, 149:7-10.)   As the Court discussed above, this payment scheme is not permissible under law and Defendants have thus violated the Consent Judgment's order enjoining Defendants from violating certain provisions of the FLSA.  *See supra* Section III(B)(1)(a).

Liveringhouse has also acknowledged that certain payroll records are incorrect due to confusion in processing payroll (*see, e.g.*, Tr. 129:24-130:19) and that he was not keeping adequate payroll records for Ms. Thompson, one of his employees. (*See id.* 141:25-142:20.) The impermissible "mileage" scheme also facilitated recordkeeping violations.

Defendants have violated the Consent Judgment. The Court therefore recommends granting the Secretary's motion and holding Defendants in civil contempt for their violations.

### D. Civil Contempt

Because the Court recommends that Defendants be held in civil contempt, it will also provide recommendations on how Defendants may purge themselves from contempt. The power to punish for contempt is inherent in all courts. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). The measure of the Court's power in civil contempt proceedings brought by the DOL is determined by the "requirements of full remedial relief." *McComb*, 336 U.S. at 193. District Courts "ha[ve] the power, upon finding an employer to be in civil contempt, to order reimbursement of unpaid wages to his employees." *Mitchell v. All-States Bus. Prods. Corp.*, 232 F. Supp. 624, 626 (E.D.N.Y. 1964). A civil contempt order may also award to the DOL the costs of investigating and bringing an action to enforce a consent judgment like the one at issue in this case. *See Chao*, 526 F. Supp. 2d at 204-05.

The Court has reviewed the Secretary's proposed Order of Civil Contempt (ECF No. 54-1) and finds that many of the suggested provisions are appropriate in order for Defendants to purge themselves of civil contempt. It also finds many of the proposed

21

sanctions appropriate.  The Court attaches to this Report and Recommendation a proposed Order of Civil Contempt for the District Court's review.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. The Secretary of Labor's Motion for Adjudication of Civil Contempt  (ECF No. 12) be **GRANTED**.

2. That Defendants All Temporaries Midwest, Inc., and Mark Liveringhouse be held in civil contempt of the Court's Consent Judgement (ECF No. 7) entered on October 11, 2017 by way of an order of civil contempt.

3. That Defendants be ordered to purge themselves of civil contempt pursuant to the proposed Order of Civil Contempt attached to this Report and Recommendation as Exhibit A.


Date: July __30__, 2021                    _____*s/Tony N. Leung*_____
                                           Tony N. Leung
                                           United States Magistrate Judge
                                           District of Minnesota


                                           *Walsh v. All Temporaries Midwest, Inc.,*
                                           *et al.*
                                           Case No. 17-cv-3330 (JNE/TNL)


22

**<u>NOTICE</u>**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, United States Department of Labor,[1] | Case No. 17-cv-3330 (JNE/TNL) |
| Plaintiff, | |
| v. | **EXHIBIT A** |
| | **PROPOSED ORDER OF** |
| All Temporaries Midwest, Inc., a Minnesota corporation, and Mark Liveringhouse, an individual, | **CIVIL CONTEMPT** |
| Defendants. | |

Defendants **ALL TEMPORARIES MIDWEST, INC.**, a corporation, and **MARK LIVERINGHOUSE**, an individual (collectively, "Defendants"), having failed to comply with this Court's Consent Judgment dated October 11, 2017 (ECF No. 7), enjoining them from future violations of the Fair Labor Standards Act of 1938, as Amended (29 U.S.C. § 201 *et seq.*) ("the Act"), it is hereby:

**ORDERED** that Defendants **ALL TEMPORARIES MIDWEST, INC.**, and **MARK LIVERINGHOUSE** are in Civil Contempt of this Court's injunction entered on October 11, 2017. Defendants are **ORDERED** to purge themselves of Civil Contempt as follows:

---

[1] This lawsuit was initiated by a previous Secretary of Labor, R. Alexander Acosta. (*See* ECF No. 1.) Walsh was sworn in as Secretary of Labor on March 23, 2021. *Office of the Secretary*, U.S. Dept. of Labor, https://www.dol.gov/agencies/osec (last visited July 23, 2021). The Court has substituted Walsh for Acosta. *See* Fed. R. Civ. P. 25(d).

1

**A.**

1.  Defendants shall pay their employees at a rate of one and one-half the regular rate for all hours worked in excess of 40 in a workweek, as required by Section 7 of the Act.

2.  Defendants shall stop falsely categorizing certain weekly payments to employees as "mileage" when these payments are not for travel expenses, as described under 29 U.S.C. § 207(e)(2), and instead should be included in their employees' regular rate for purposes of calculating overtime.

3.  Defendants shall have a recordkeeping system in place that includes making, keeping, and preserving complete and accurate time, pay, and employment records that comply with Section 11 of the Act and 29 C.F.R. Part 516.

**B.**

1.  Defendants shall submit complete and accurate time, pay, and employment records for the period from October 2019 to the present to the Plaintiff no later than 30 days after the date of this Order.

2.  Defendants shall pay back wages due employees, and an equal amount as liquidated damages, as a result of continuing and/or additional violations, if any, determined to be due by the Plaintiff's review of Defendants' records described above since October 2019 to the present, within 15 days of Plaintiff providing notice to the Defendants of additional violations.

**C.**

1.  Defendants shall hire, at their own cost, an independent, arms-length, third-party CPA knowledgeable of the minimum wage, overtime, and recordkeeping provisions of the

Act and the regulations promulgated thereunder to perform three annual audits of Defendants to determine compliance with the Act. The audits shall include a review of time and payroll records and record keeping practices of the Defendants for the previous twelve-month period to determine compliance with the Act and the provisions of this Order, including, but not limited to, accurate record keeping of hours worked, proper payment of the overtime premium for hours worked in excess of 40 in a workweek, and full and accurate calculation and recording of employees' "regular rate." The aforesaid three audits shall be conducted annually with the initial audit commencing within three months of the entry of this Order.

2.  The accounting firm shall report the findings and recommendations, in writing, to Defendants. If any of the audits determine that any employee was not paid the proper overtime premium or minimum wage, the auditor shall inform Defendants immediately, and Defendants shall pay all wages due and owing within 10 days of the audit's completion and note corrective action taken in the audit reports. The Defendants shall make the reports available for review and copying to the Department of Labor's Wage and Hour Division upon request.

3.  Without limiting the obligations of Defendants, Defendants shall retain such records and reports referenced herein for a period of no less than five years after the year to which such records and reports apply, and shall make such records and reports available to Plaintiff upon request.

3

**D.**

1. Defendants shall pay to the Plaintiff for his fees and expenses incurred in bringing and prosecuting this contempt proceeding, which constitutes attorney work at a rate of $250.00 per hour by certified or cashier's check.  Plaintiff shall file an affidavit for hours worked on this matter within seven days of the entry of this Order.

2. All payments, fees, expenses, costs, fines, and the like hereunder shall be made promptly and shall be the joint and several obligations of Defendant **ALL TEMPORARIES MIDWEST, INC.**, and Defendant **MARK LIVERINGHOUSE**.


It is further **ORDERED** that a fine in the amount of $150 per day is hereby imposed upon Defendants for each day they fail to purge themselves fully of Civil Contempt beginning on and including the 31st day after the date of this Order.


Date: _____

_____
JOAN N. ERICKSEN
United States District Judge


*Walsh v. All Temporaries Midwest, Inc., et al.*
Case No. 17-cv-3330 (JNE/TNL)

4